IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Barry T. Sparks, | ) | C/A No.: 3:15-1247-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| The Columbia City Ballet and William Starrett, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In this employment discrimination case, Barry T. Sparks ("Plaintiff") sues his former employer, the Columbia City Ballet (the "Ballet") and its artistic director William Starrett ("Starrett") (collectively "Defendants"). This matter comes before the court on Plaintiff's motion for contempt against Defendants. [ECF No. 23]. The undersigned conducted a hearing on the motion on January 27, 2016. [ECF No. 29]. The motion having been fully briefed [ECF Nos. 26, 27, 34, 35, 38, 42], it is ripe for consideration. For the reasons that follow, the undersigned recommends the district judge award costs and attorney's fees associated with the discovery abuse to Plaintiff and inform the jury of the misconduct.

I.     Factual and Procedural Background

The Ballet is a non-profit arts organization governed by a Board of Directors ("Board") and an Executive Committee ("Executive Committee"). Plaintiff was employed as the technical director/lighting designer for the Ballet from December 1989 until his termination on February 23, 2014. [ECF No. 1 at 12]. On November 22, 2013,

Plaintiff was hospitalized for three days while he was treated for an abdominal obstruction. *Id*. at 4. He was hospitalized from January 11–25, 2014 for an abdominal blockage and from January 31–February 7, 2014 for life-threatening blood clots. *Id*. at 4–5. Although Plaintiff's doctor released him to work without restrictions on February 18, 2014, he was terminated on February 23, 2014. *Id*. at 5–6.

Plaintiff filed his complaint on March 17, 2015, alleging claims of: (1) breach of fiduciary duty pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1132(a)(3); (2) violation of the Civil Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964(c); (3) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (4) discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*; (5) retaliation in violation of ERISA Section 510; (6) violation of the Fair Labor Standards Act, 29 U.S.C. § 207, (7) retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2615(a)(1); (8) breach of contract; (9) violation of the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-1-10, *et seq.*; and (10) conversion. [ECF No. 1].

On June 12, 2015, Plaintiff served his first set of interrogatories and requests for production to Defendants. [ECF No. 27-1]. Among the requests, Plaintiff asked Defendants to produce all communications to the Ballet Board from November 13, 2013, that relate to Plaintiff. Defendants served their responses on August 20, 2015. On November 18, 2015, Starrett was deposed. [ECF No. 27-2]. Starrett testified that Plaintiff's health was discussed at Executive Committee meetings:

> Q.      All right. Did you make the decision as a result of the conversations with Ms. Harris and Mr. Ray to terminate Mr. Sparks?
> A.      Ultimately, it was my decision.
> Q.      You mentioned it was discussed at an executive committee meeting; is that right?
> A.      Yes.
> Q.      When did that meeting take place at which this issue was discussed?
> A.      I think -- I think in the January and February board meetings.
>         It was more Mr. Sparks' health concerns we discussed. And if the productions were -- if the productions were -- the production needs were being met.
>         I don't -- there was never at the board meeting a discussion that: By the way, I'm going to release Mr. Sparks, and this is my plan.

Starrett Dep. at 47:4–21.[1] Starrett also testified that both the Board and its Executive

Committee meet monthly and that minutes are kept for each meeting:

> Q.      And there is an executive committee?
> A.      Right.
> Q.      And so I would really -- the executive committee has meetings and takes actions apart from the full board; correct?
> A.      Yes.
> Q.      All right. And there are -- they meet what? Monthly?
> A.      Yes.
> Q.      And the board meets the -- full board meets monthly?
> A.      Yes.
> Q.      And there are minutes done for each of those groups; right?
> A.      Correct.

*Id*. at 49:2–16.  Finally, when Plaintiff's counsel noted the lengthy gaps in the minutes

Defendants had produced, Starrett had no explanation:

> Q.      Mr. Starrett, I asked in this case for all of the board minutes and the executive committee minutes in the relevant time frame. And there are huge gaping holes in what was produced. The first date for the minutes is November 26, 2012. And then it jumps all the way to September of 2014. Can you explain to me why nothing in the entire almost two-year period there was produced?

---

[1] Starrett's deposition may be found at ECF No. 42-1. His deposition was subsequently continued, but the continued portion is not part of the record.

A.    No.
Q.    And the executive committee meeting, the same thing, spotty production that leaves out a lot in the key months. Can you explain why that is true?
A.    No. To my knowledge, all the board minutes are kept and stored in the office. I don't know why you wouldn't have them.

*Id*. at 52:8–53:1. On November 20, 2015, Plaintiff's counsel sent defense counsel a letter listing the dates of the meeting minutes that had been produced and requesting the missing minutes. [ECF No. 23-2]. A review of the dates reveals that no Board meeting minutes were produced for December 2012 until August 2014. *Id*. The same is true for the Executive Committee minutes, with the exception of minutes for January and April 2014. *Id*.

On December 18, 2015, Plaintiff's counsel requested a telephonic conference with the court to discuss the status of the case, including the deficiency in Defendants' discovery responses. After discussion, the court ordered that Defendants supplement their discovery responses by January 11, 2016, and submit an affidavit to verify that the responses were complete. [ECF No. 22]. On January 9, 2016, Defendants submitted an affidavit of Starrett ("First Affidavit") to Plaintiff. [ECF No. 23-4].

On January 13, 2016, Plaintiff filed the instant motion for contempt, and argued that Starrett's First Affidavit, did not meet the order of the court. [ECF No. 23]. Specifically, the First Affidavit listed the minutes previously produced and did not provide any explanation as to the missing minutes. *Id*. at 23-4. The undersigned set a hearing on the motion for contempt for January 20, 2016, and ordered Defendants to respond to the motion and submit a revised affidavit by January 19, 2016, that complied

4

with the court's order. [ECF No. 24]. Pursuant to the court's order, Starrett submitted a

second affidavit on January 19, 2016, that specifically identified dates for which no

Board minutes had been identified ("Starrett's affidavit" or "Second Affidavit"). [ECF

No. 26-2]. Starrett's affidavit stated:

> I, William Starrett, Executive Director of The Columbia City Ballet, have
> been fully advised of the penalties for contempt of court and/or making a
> false statement to a United States District Court, and I have been further
> advised that there is a maximum penalty of six months incarceration in a
> federal penal facility for such contempt. Having been advised therein, I
> certify that under my supervision Brian Maynor, Corporate Secretary for
> The Columbia City Ballet, has made a complete search of all corporate
> records and that we were not able to locate the following documents
> requested in the underlying litigation:
>
> 1) Columbia City Ballet Board Meeting Minutes for the following dates:
>     a. November 2013
>     b. December 2013
>     c. January 2014
>     d. February 2014
>     e. March2014
>     f. April 2014
>     g. May 2014
>     h. June 2014
>     i. July 2014
>     j. August 2014
>     k. December 2014
>
> 2) Columbia City Ballet Executive Committee Minutes for the following
> dates:
>     a. December 2013
>     b. February 2014
>     c. March 2014
>     d. May 2014
>     e. June 2014
>     f. July 2014
>     g. August 2014
>     h. October 2014
>     i. December 2014

The Ballet Board did not meet on the dates listed in (l)(a)–(k) above and therefore no meeting minutes for those dates exist. Likewise, the Ballet Executive Committee did not meet on the dates listed in (2)(a)–(i) above and therefore no meeting minutes for those dates exist.

The Ballet has provided a copy of meeting minutes for each and every Board and Executive Committee meeting held from November 1, 2013 to December 31, 2015, the time period covered by Plaintiffs discovery request.

I hereby submit this information with the full knowledge that it is material to the underlying civil action and with the further knowledge that this Affidavit is submitted under penalty of perjury for obstruction of justice and submitting a false statement to a United States District Court.

[ECF No. 26-2]. Defendants also submitted the affidavit of Robert DeBerry, the Ballet's director of finance, who had been assisting Starrett and counsel in the search for records responsive to Plaintiff's discovery requests. [ECF No. 26-3]. DeBerry's affidavit noted that they located one set of missing the Executive Committee minutes (from November 14, 2013), in the back of one of Starrett's file folders. *Id*. at ¶8.

On January 20, all parties were present for the hearing, but after discussions off the record and at Defendants' request, the court continued the hearing until January 27. On January 25, 2016, Defendants produced 333 pages of Board and Executive Committee meeting minutes, including minutes from six Board meetings and three Executive Committee meetings that Starrett had affirmed in his affidavit never occurred. Trans. at 7:12–9:7.[2]

On January 27, 2016, the court held a hearing on the motion for contempt. Starrett testified that the Ballet's by-laws require that the Board meet five times a year, that three

---

[2]  The hearing transcript may be found at ECF No. 37.

months is the longest he recalls the Board going without a meeting, and that the annual meeting is in April. Trans. at 22:5–13; 59:12–15. Starrett admitted that he had falsely stated in the Second Affidavit that Defendants had produced all minutes for meetings that occurred. *Id*. at 34:2–4. Though Plaintiff's counsel had noted during Starrett's deposition and in multiple letters to counsel the lengthy gaps in the minutes produced, Starrett testified that he realized for the first time when he looked at the dates in the Second Affidavit on January 20, 2016,[3] that it "just doesn't look right" and that they "must have had board meetings during this time." *Id*. at 34:5–8. Starrett stated that he had "terribly depended and relied on Robert [DeBerry] and Mr. [Brian] Maynor to provide this information." *Id*. at 58:16–18.

DeBerry also testified at the hearing. DeBerry testified that he and Maynor had an email miscommunication regarding the document production, such that Maynor sent him the documents that had already been produced instead of searching for documents that had not been produced. *Id*. at 77:22–79:3.[4] DeBerry also testified that, as an attendee of the Board meetings, he receives a minimum of two emails noting the date of the meeting, one of which has the minutes attached. *Id*. at 89:11–90:9, 92:10–25. However, as of the hearing, DeBerry had not checked his emails to determine the dates of the meetings. *Id*.

---

[3] This was during a private meeting between Defendants and their counsel at the courthouse one day after Starrett submitted his Second Affidavit. Defendants were at the courthouse for the hearing, which was continued until January 27, 2016, at Defendants' request.

[4] Defendants rely on this email miscommunication between DeBerry and Maynor to show that their failure to produce the minutes was a mistake. The email has never been made a part of the record, and DeBerry's explanation of the miscommunication is confusing. Trans. at 77:22–79:3. *Id*.

Starrett and Maynor also testified that they did not search their emails when searching for the minutes or drafting the affidavits. *Id*. at 43:11–45:23 (Starrett); 104:1–24 (Maynor).

Brian Maynor, corporate secretary for the Ballet, also testified. Although Starrett's Affidavit stated that Maynor had performed a search under Starrett's supervision, Maynor testified that he had never searched for the minutes under Starrett's supervision. *Id*. at 103:16–19. In fact, Maynor testified he had never seen the requests for production prior to January 20, 2016. *Id*. at 97:14–16. Specifically, Maynor testified that on January 20, 2016, while at the courthouse for the hearing:

> We were looking through [defense counsel's] notebook of official court documents. Again, I have not seen any requests. The only time I had been ever even mentioned about minutes regarding this case was in the email. I saw the missing minutes that were testified that never existed and was quite concerned because of the amount of consistent dates that there clearly was a mistake.

*Id*. at 99:2–8. Maynor testified that he then checked his home computer where he maintains all of the minutes, cross-referenced the dates with his email and calendar to be sure he had all of the minutes, and submitted the minutes for production. *Id*. at 99:12–100:15.

At the end of the hearing, Plaintiff's counsel asked for a copy of the Artistic Director's reports ("AD reports") that had been referred to in the minutes produced January 25, 2016, and noted that they were responsive to request for production no. 18. *Id*. at 117:18–118:8. Defendants agreed to produce and did produce the AD reports on January 29, 2016. *Id*. at 118:12. The AD reports indicate that Starrett attended "Executive Board meetings" on February 14, 2014, February 27, 2014, and March 5, 2014. In

response, Defendants argue that the term "Executive Board meeting" as used in the AD reports was "inartful," but referred to Starrett's "meetings with committees or various members of the Board." [ECF No. 35 at 1–2]. Defendants produced the affidavit of Jason Cobb, the Ballet Office Manager, to support this assertion. Cobb's affidavit states that he has conducted research and based on this research he provides general explanations that Starrett was meeting with smaller subsets of the Board or the Executive Committee during these dates.[5]

On April 22, 2016, the court directed Defendants to provide a summary and description of any supplemental discovery production since the January 27, 2016 hearing. On April 25, 2016, Defendants' counsel indicated that the Ballet had provided over 1400 pages of "emails and documents dating from 2002 to 2015 that in any way mention Barry Sparks or otherwise are part of a search term hit." [ECF No. 47 at 1]. Defendants' counsel indicated that they were prepared to produce all the documents that are not protected by the attorney-client privilege. *Id*. at 2. Plaintiff's counsel filed a response the following day indicating that he was not aware of the search and not received any of the documents. [ECF No. 48]. He further noted that Plaintiff's first set of requests for production served June 12, 2015, requested "All text messages, emails, or other written

---

[5] Cobb states that the February 14 meeting was a rescheduled meeting of the Corporate Development Committee followed by a Finance Committee meeting, the February 27 meeting was a "general emergency meeting called for the purpose of discussing the need for emergency funding," and the March 5 meeting was with the Finance Committee. The undersigned notes that, pursuant to request for production no. 18, all documents containing communications related to these meetings, if any, should have been searched to determine whether they related to Plaintiff.

communications related in any way to Plaintiff between November 2013 and the present." *Id*.

II.    Discussion

    A.    Law

Rule 37(d) of the Federal Rules of Civil Procedure gives the district court wide discretion to impose sanctions for a party's failure to comply with its discovery orders. While a district court has discretion in fashioning a discovery sanction under Rule 37, this discretion is tempered when the sanction terminates the action without a decision on the merits. *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 503 (4th Cir. 1977).[6] To balance these competing interests and determine whether default judgment under Rule 37 is an appropriate sanction, a court must consider the following four factors: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice the noncompliance caused the adversary; (3) the need for deterring the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. *Mutual Fed. Sav. & Loan Ass'n,* 872 F.2d 88, 92 (4th Cir. 1989). This balancing test "[i]nsure[s] that only the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules, will result in the extreme sanction of dismissal or judgment by default." *Id.* In such cases, not only does the noncomplying party jeopardize his or her adversary's case by such indifference, but to ignore such bold challenges to the district court's power would encourage other litigants

---

[6] Although the undersigned has not been asked to consider a sanction that would terminate the action without a decision on the merits, the tests provided for such a sanction are also relevant to lesser sanctions.

to flirt with similar misconduct. *Id.* (citing *National Hockey League*, 427 U.S. 639, 643 (1976); *Wilson*, 561 F.2d at 504).

B.     Analysis

1.     Bad Faith

After a review of all the evidence, the undersigned finds that Defendants' failure to timely produce the minutes was in bad faith.  Specifically, bad faith is demonstrated by: 1) Defendants' submission of false affidavit testimony regarding when Board and Executive Committee meetings occurred and the existence of minutes recording the same—the precise information the court had ordered the affidavit to verify; (2) Defendants' failure to take meaningful actions to determine the truth or falsity of Starrett's affidavit; (3) Starrett's false affidavit testimony that Maynor had conducted the search under his supervision; and (4) Defendants' failure to take responsibility for their repeated failure to provide Plaintiff with complete and correct discovery responses.

No later than November 18, 2015, the date of Starrett's deposition, both he and defense counsel were aware that there were gaping holes in Defendants' document production, for which they offered no explanation. Starrett Dep. at 52:8–53:1 (testifying both that the full Board and Executive Committee met monthly and that he had no explanation for large gap in the minutes produced). Defendants were reminded of the production deficiencies by Plaintiff's counsel's November 20, 2015 letter. The deficiencies were further discussed at a conference call with the court on December 18, 2015, prompting the court to order Defendants to supplement the responses and to submit an affidavit to verify the responses were complete. [ECF Nos. 21, 22].  In response,

11

Defendants submitted the First Affidavit, which did not meet the purpose of the court's order and failed to acknowledge or provide an explanation for the gaps in the meeting minutes. [ECF No. 23-4]. The court ordered Defendants to provide a revised affidavit that addressed the minutes that had not been produced. [ECF No. 24]. In response, Starrett swore under oath that the Board had not held meetings from November 2013 until August 2014 and that the Executive Committee had met only twice between December 2013 and August 2014, which he should have known was false. Viewed in the light most favorable to Defendants, Starrett's affidavit can only be characterized as submitted with utter disregard for the truth.

Defendants have suggested that Starrett's false affidavit was nothing more than an innocent mistake, but the evidence shows that Defendants took no meaningful action to determine the truth or falsity of Starrett's statements. Faced with a second court order requiring an affidavit to verify their discovery production was complete after the holes in the production had been highlighted multiple times, Defendants, through Starrett, testified he relied on DeBerry to conduct searches. Trans. 32:16–25. Starrett testified that he searched his "books" to "test" that they had looked through "everything," and admits that he found minutes from an executive Board meeting. *Id*. at 33:1–19. Therefore, Starrett was on notice that Defendants' prior searches had been inadequate to find all the minutes. However, instead of acknowledging that prior searches had been insufficient to ensure production was complete, Starrett chose to swear under oath that no other minutes existed because such meetings had not taken place.

Starrett also swore under oath that "under my supervision Brian Maynor, Corporate Secretary for The Columbia City Ballet, has made a complete search of all corporate records . . . ." [ECF No. 26-2]. However, Maynor testified Starrett had never supervised him in looking for meeting minutes. Trans. at 103:12–19. Maynor also testified that the only time had had been asked to search for Board minutes at any time was once in November 2015 by DeBerry, and the request was only for specific dates. Trans. 97:14–20; 106:19–21; 108:9–17. Maynor was first shown the discovery requests at the courthouse on January 20, 2016, and immediately realized that Starrett's affidavit could not be correct because of the number of consecutive months missing. Trans. at 97:14–19; 99:2–8. Maynor's testimony made clear that, contrary to conducting a search under Starrett's supervision, he had simply complied with one request from DeBerry in November 2015 to provide a limited set of Board minutes.

Defendants have failed to take responsibility for their actions. Although Starrett agreed with his attorney in offering an apology to the court (Trans. at 35:11–22), he also testified that his "terrible mistake" was to rely on DeBerry and Maynor (Trans. at 58:16–18). Additionally, Defendants have emphasized that discussion of Plaintiff's termination was not found in the missing minutes (Trans. at 36:8–37:9), but fail to recognize that Plaintiff is mentioned in some of the minutes. Even in conceding that "a mistake was made," Defendants' filings appear to mock the suggestion that they should be held accountable for their submission of a false affidavit to the court. For instance, Defendants argue: "Beyond the vitriol of Plaintiff counsel in court at the hearing on January 27, and in his filings and letters surrounding this matter, the issue remains—how does the time,

effort, numerous lengthy filings, and this exercise regarding Board minutes move this case forward?" [ECF No. 42 at 2]. Such statements demonstrate that Defendants do not acknowledge that Plaintiff would still be without the minutes to which he was entitled if Plaintiff and the court had not expended considerable time and resources questioning Defendants. Defendants urge the court to accept that one mistake or miscommunication between DeBerry and Maynor caused this issue and it has now been remedied. However, Defendants ignore that the miscommunication between DeBerry and Maynor occurred in November 2015, and could have been discovered with minimal effort in the month following.

Defendants also fail to acknowledge that, in trying to determine why Board minutes were missing, Plaintiff's counsel uncovered Defendants' failure to meet their discovery obligations with regard to several other production requests. For instance, at the hearing, Plaintiff's counsel asked for the AD reports that had been referenced in the Board meeting minutes. He noted that they appeared to be responsive to request for production no. 18, which states: "If related in any way to the Plaintiff between November 2013 and the present, all communications given to or received by the Ballet Board members, minutes of Board meetings, and documents generated or read by Board members." [ECF No. 27-1 at 6]. Defendants produced the AD reports, which included references to Plaintiff's hospitalization and to Starrett's meetings with attorneys to discuss Plaintiff. [ECF No. 38-2 at 65, 67, 81]. Instead of recognizing that they should have included the relevant AD reports in their first document production, Defendants argue "Plaintiff utilizes the Sur Reply to attack the Artistic Director Reports. Those

reports were never requested before the January 27 hearing. Based upon a *sua sponte* request by counsel for Plaintiff at the hearing, Defendants stated that they would provide the reports." [ECF No. 42 at 8].

Another example of Defendants' failure to take their discovery obligations seriously is their apparent failure to search their emails. Starrett testified that he receives at least one email regarding every Board meeting, but he did not check his emails to determine when Board meetings were held. Trans. 43:11–45:23. DeBerry also testified that he received the emails regarding the meetings and containing the minutes, but failed to check them. *Id*. at 89:11–90:9. Maynor also testified that he had never seen the discovery requests prior to January 20, and had never been asked to review his records to check that all the minutes had been produced. *Id*. at 103:4–11; 106:11–18. On the court's request for an update in discovery, on April 25, 2016, Defendants stated that since the hearing, the Ballet has found "a number of emails and documents dating from 2002 to 2015 that in any way mention Barry Sparks or otherwise are part of a search term hit." [ECF No. 47 at 1]. Defendants stated that the search "was a step taken well above and beyond the scope of Plaintiff's discovery requests." *Id*. The undersigned notes that while the date range may exceed the scope of the discovery requests, Plaintiff's request for production no. 19 sought "All text messages, emails, or other written communications related in any way to Plaintiff between November 2013 and the present." As of April 26, 2016, Plaintiff had not received any of the documents referenced in Defendants' letter. [ECF No. 48].

Therefore, the undersigned cannot agree with Defendants that the issue related to the Board meetings was a simple mistake. Defendants have established a pattern of ignoring their discovery obligations and have disavowed any responsibility for their failures to comply.

### 2.    Prejudice

Plaintiff has suffered great prejudice as a result of Defendants' behavior. Assuming that Defendants have now provided Plaintiff with all of the minutes from Board meetings, they still had not provided Plaintiff with all requested discovery as of April 26, 2016. Further, as Defendants do not appear aware of their discovery obligations, Plaintiff cannot be confident that Defendants have provided all responsive documents.[7] Further, even if the court were to ignore the time and expense Defendants have caused Plaintiff and the court in holding Defendants accountable, Plaintiff's day in court has been delayed by close to a year while Defendants' discovery deficiencies were sorted out.

### 3.    Deterrence

The court must also consider the deterrent effect in determining an appropriate sanction. The Supreme Court has dictated that "the most severe in the spectrum of sanctions provided by statute must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction,

---

[7] Although not before the court at this time, Plaintiff has significant concerns about the disappearance of Starrett's text messages related to this case after a preservation letter had issued. Plaintiff's inability to rely on Defendants' discovery responses as true and accurate causes him significant prejudice.

but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976). An appropriate sanction must have enough teeth to have a deterrent effect, both in the remainder of this case and for future litigants.

    4.    Sanctions

Plaintiff requests the court sanction Defendants by: (1) charging the jury that Starrett testified falsely under oath on a material issue; (2) warning Defendants that if similar conduct occurs, the court will enter judgment for Plaintiff as a sanction; (3) ordering Defendants to supplement their discovery responses to ensure they are complete; and (4) ordering Defendants to pay Plaintiff's costs and attorney's fees associated with the motion. [ECF No. 38]. In contrast, with regard to sanctions, Defendants argue "the hearing on January 27 was a difficult hearing and one that each of the three witnesses will have an unpleasant memory of through this case and perhaps eternity. Therefore, the hearing itself serves as a sanction." [ECF No. 42 at 10]. Defendants also complain that "[a]s a result of this process, Plaintiff's counsel now has board minutes that give him insight into all aspects of the Ballet and Artistic Reports that show the activities of the Ballet." *Id*. The undersigned notes that to the extent Defendants have provided broader discovery than was requested, they have chosen to do so. However, requiring Defendants to comply with discovery rules is not a sanction in itself.

    a.    Jury Instruction

In determining an appropriate sanction, the undersigned finds *Network Computing Services Corp. v. Cisco Systems, Inc.*, 223 F.R.D. 392 (D.S.C. 2004), instructive. In

*Network Computing Systems*, the Honorable Joseph F. Anderson, Jr., then-Chief United States District Judge, found that "[a] moderate approach of informing the jury about the misconduct is especially appropriate in those rare cases where there has been clear and sanctionable conduct by one of the parties." 223 F.R.D. at 400. Judge Anderson found that one of the litigant's conduct in informing a magistrate judge that documents did not exist, which were later determined to exist, warranted such a sanction. *Id*. The withholding litigant in that case argued, as do Defendants in this matter, that no prejudice accrued because the documents were eventually produced. *Id*. Judge Anderson noted that this argument ignored the fact that the documents were produced only after several contentious discovery battles before the magistrate judge. *Id*. Therefore, Judge Anderson found that informing the jury of the misconduct was tailor-made for such a case. *Id*. at 401.

In so holding, Judge Anderson found that Fed. R. Civ. P. 37(d) authorized the court to inform the jury of the misconduct by a litigant. 223 F.R.D. 399–400 ("[A]lthough Rule 37(d) does not contain an explicit authorization to inform the jury of the misconduct by the litigant (as is the case with the failure to make Rule 26 disclosures), the Rule clearly gives this court broad discretion to 'make such orders . . . as are just' including the extreme sanctions of dismissal and default judgment. If the court has the express authority to impose such harsh remedies, it certainly has the implied authority to impose a less severe sanction, especially when that sanction is one authorized by a corresponding rule regarding failure to make Rule 26 disclosure responses.").

In the instant case, the undersigned recommends that the district judge inform the jury of Defendants' misconduct as follows:

> Ladies and gentlemen, in this case as in every civil case in the federal court system, as part of the trial preparation process the parties are entitled to request information from each other in a process that is known as discovery. Occasionally, disputes arise as to exactly what information has to be produced and whether any such information is in existence.
>
> In this case, Plaintiff asked Defendants for all communications given to or received by Ballet Board members between November 2013 and June 2015 that related to Plaintiff in any way. Upon the court's order after Plaintiff questioned the large gaps in minutes Defendants produced, Mr. Starrett testified under oath in an affidavit that the Ballet had provided all minutes for meetings of the Board and Executive Committee that existed. Mr. Starrett also testified under oath that if meeting minutes were not produced, meetings had not occurred. Subsequently, Mr. Starrett's affidavit was determined to be false. The meeting minutes have now been produced to Plaintiff. You may consider this conduct by Defendants, along with all the other evidence that you hear during the trial, in deciding the issues presented for your determination in this case.

The undersigned finds that such an instruction is a tempered approach to Defendants' misconduct, as it does not address Defendants' failure to produce other documents that were requested, but that were not addressed in the affidavit, such as the relevant AD reports.

### b.    Compliance with Discovery Rules

The undersigned also advises Defendants that if similar conduct occurs or is discovered, the undersigned will recommend judgment be entered for Plaintiff. Defendants are directed to ensure all of their discovery responses are now complete and to immediately supplement any discovery responses as required pursuant to the Federal Rules of Civil Procedure.

c.    Attorney's Fees and Costs

In addition, the undersigned recommends the district judge award Plaintiff costs and attorneys fees, as discussed further below. In support of his request for attorneys' fees, Plaintiff submits the affidavit of his counsel, Blaney A. Coskrey III, Esq., showing that Coskrey spent 62.1 hours related to the motion for contempt, including his informal attempts to obtain the requested discovery. [ECF No. 38-3]. Plaintiff's counsel submits that his standard hourly rate for 2016 is $350/hour, and requests a total of $21,735 in attorney's fees. *I*d. at 5–7. He also requests $606.20 in costs for obtaining the January 27 hearing transcript and for copy and scanning costs. *Id*. at 7. Defendants object to the amount of time spent and the rate sought, and note that there is no indication that Plaintiff agreed to pay his counsel at this rate.[8]

In determining what constitutes a reasonable number of hours and the appropriate hourly rates (i.e., in calculating the lodestar fee), the court considers the following factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the

---

[8] While not relevant to an award of attorney's fees, Defendants also note that the amount of attorney's fees sought "roughly amounts to 50% of Barry Sparks' annual pay when he was employed by the Ballet." [ECF No. 42 at 11]. The undersigned notes with great disappointment that both parties have spent considerable expense relative to the value of the case in litigating an issue that should have been a routine discovery matter.

undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978); *Jackson v. Estelle's Place, LLC*, 391 Fed. App'x 239, 243–44 (4th Cir. 2010). Although the court must consider all twelve of the factors, it need not rigidly apply these factors, as not all may affect the fee in a given case. "[T]hese factors should be considered in determining the reasonable rate and the reasonable hours, which are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee." *E.E.O.C. v. Serv. News Co.*, 898 F.2d 958, 965 (4th Cir. 1990). In determining whether a rate is reasonable, the court is to consider "prevailing market rates in the relevant community." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir.1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). Further, this court's Local Civ. Rule 54.02(A) provides that attorneys' fee petitions must comply with *Barber* "and shall state any exceptional circumstances and the ability of the party to pay the fee." Local Civ. Rule 54.02(A) (D.S.C.).

With these factors in mind, the court considers Coskrey's affidavit requesting fees for work that he performed related to this motion. Although Coskrey does not expressly discuss the *Barber* factors, the court finds that his affidavit appropriately addresses many of the same considerations. With regard to the amount of the work involved, the court acknowledges that 62.1 hours is higher than expected for a motion for contempt related to discovery. However, the court is mindful that both Plaintiff and the court spent considerable time demanding that Defendants comply with the discovery rules before and

21

after Plaintiff's motion was filed. After a consideration of the substantial time the court has been forced to spend on this issue, which should be lower than Plaintiff's counsel's time, the undersigned finds that the amount of time claimed by Plaintiff's counsel is reasonable under the circumstances of this case.

However, Coskrey's affidavit does not satisfy the requirement that one seeking attorneys' fees must establish those fees to be comparable to customary fees for like work in the relevant market of the District of South Carolina or the reasonableness of the rates requested. *See generally Grissom v. Mills Corp.*, 549 F.3d 313, 323 (4th Cir. 2008) (reversing fee award, in part because "Plaintiff offered no specific evidence that the hourly rates sought for his attorneys coincided with the then prevailing market rates of attorneys in the [district] of similar skill and for similar work, which our case law required him to do."); *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) ("In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award.").

Without specific support for the requested rates, the court cannot analyze the reasonableness of the hourly rate requested. Nonetheless, the court may draw on its own knowledge of litigation rates often charged in this district. *See Joe Hand Promotions, Inc. v. The Precint Bar-DAXLAM, Ltd.*, 3:10-199-CMC, 2010 WL 3420189 (D.S.C. Aug. 23, 2010) (finding requested fees to be reasonable based on court's "own knowledge of rates charged in litigation in this court" for "similar work in this geographic area[,]" while

admonishing counsel to comply with the requirements of *Grissom* and *Plyler* in any future fee petitions).

Previously, the undersigned has considered fee applications and found it could not recommend awarding fees in excess of $200/hour for counsel because counsel had not provided sufficient record evidence regarding the appropriateness of higher fees in the South Carolina legal market for that type of work. *Mary Kay, Inc. v. Ayres*, 827 F.Supp.2d 584, 593–94 (D.S.C. 2011) (citing findings in *City of Myrtle Beach v. United Nat'l Life Ins.*, 4:08-1183-TLW-SVH, ECF No. 91 at 24−25 (D.S.C. Aug. 27, 2010)). However, the undersigned has noted that if counsel provided additional information demonstrating that the higher hourly fees were appropriate, the district judge could choose to award additional fees in ruling on the report and recommendation. *Id.*

In this case, the court does not have documentation to support a market rate higher than $200/hour, nor does it have independent knowledge of recent higher fees charged in this geographic area for matters similar to this one. Accordingly, the court recommends that Coskrey's rate be reduced from $350 to $200/hour. By the court's calculations, this would reduce the fee award to $12,420. In the event that, during the period within which it may file objections to this report and recommendation, Coskrey complies with the *Grissom* and *Plyler* requirements, the district court may wish to award a different amount of fees.

Based on the information and supporting documents before the court at this time, the undersigned recommends that Defendants' sanctions include an award of $12,420 in attorneys' fees and $606.20 in costs to Plaintiff.

III.    Conclusion

For the foregoing reasons, the undersigned recommends the district judge grant Plaintiff's motion for contempt and sanction Defendants by: (1) informing the jury of Defendants' misconduct; (2) advising Defendants that any further misconduct will result in judgment for Plaintiff; (3) requiring Defendants to ensure that they have fully responded to, and supplemented if applicable, all Plaintiff's discovery requests; (4) awarding Plaintiff attorney's fees of   $12,420 and costs of $606.20, to be paid by Defendants.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 10, 2016                                        Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).